**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| _____ | : | |
| MARK STOKES, *et al*, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| NEW JERSEY MANUFACTURERS | : | |
| INSURANCE COMPANY, | : | No. 23-114 |
| Defendant. | : | |
| _____ | : | |
| MARK STOKES, *et al*, | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| NEW JERSEY MANUFACTURERS | : | |
| INSURANCE COMPANY, | : | No. 24-2127 |
| Defendant, | : | |
| | : | |
| vs. | : | |
| | : | |
| BERNARDO RODRIGUEZ TREJO, | : | |
| Respondent. | : | |
| _____ | : | |

**<u>Memorandum Opinion</u>**

**PAMELA A. CARLOS**                                                                                   **July 19, 2024**
**U.S. MAGISTRATE JUDGE**

  This case involves personal injuries sustained by Plaintiff Mark Stokes ("Mr. Stokes") following a motor vehicle accident between Mr. Stokes and a semi-truck bearing the decal of Xima Transportation Corporation ("Xima"). Mr. Stokes, together with his wife, Kimberly Stokes ("Ms. Stokes") (collectively, "Plaintiffs"), allege that the truck's operator was uninsured at the time of the accident, thus prompting them to file a Complaint against their insurer, Defendant New Jersey Manufacturer's Insurance Company ("Defendant" or "NJM"). Mr. Stokes seeks uninsured

motorist benefits from NJM's household automobile policy, and Ms. Stokes alleges she suffered loss of consortium due to the accident. Presently before the Court are four motions—(1) Plaintiffs' motion to compel the deposition and production of documents by a non-party individual; (2) Plaintiffs' motion to transfer the civil action to the arbitration program, (3) Plaintiffs' motion for leave to file an amended complaint; and (4) Defendant's motion for summary judgment.

For the reasons that follow, Plaintiffs' motions are denied, and Defendant's motion is granted. As such, the matter is dismissed in its entirety, with prejudice.

I.      **BACKGROUND**

   A.  **Factual Background.**

On March 1, 2021, Mr. Stokes was driving in Taylorsville, Pennsylvania when debris fell from a commercial semi-truck and struck his vehicle. *See* Doc. No. 1 at ¶ 8, Doc. No. 41 at ¶ 2, and Doc. No. 42 at ¶ 1. Mr. Ruben Dario Beltre Ramirez ("Mr. Ramirez") was operating the semi-trailer truck involved in the accident. *See id*. Mr. Stokes attempted to communicate with Mr. Ramirez but was unable to do so because Mr. Ramirez did not speak English. *See* Doc. No. 41-9 at 8 (N.T. at 24:3-9).[1]

Shortly thereafter, Mr. Stokes called the police who arrived at the scene. *See id.* (N.T. at 25:21-24). According to Mr. Stokes, the police did not obtain any insurance information from Mr. Ramirez and did not issue any tickets or citations in connection with the accident. *See id*. 8-9 (N.T. at 26:19-21, 27:21-23). Mr. Stokes further explained that while the police were present, Mr. Ramirez called someone who spoke on his behalf. *See id.* at 12 (N.T. at 42:13-15). Mr. Stokes communicated directly with this individual, whom he believed to be a "dispatcher" of some sort.

---

[1]      Doc. No. 41-9, or Exhibit "F" to Defendant's motion for summary judgment, contains the transcript of Mr. Stokes' deposition.

*See id.* at 11 (N.T. at 35:8-14). According to Mr. Stokes, the police had no questions for this "dispatcher." *See id.* at 12 (N.T. at 42:16-18).

However, Mr. Stokes explained that given the communication difficulties, the police told him he should take a picture of Mr. Ramirez's license and truck. *See id.* at 9 (N.T. at 3-9). Mr. Stokes complied, and his photograph confirmed that the semi-trailer truck had a "Xima Transportation Corp." decal that displayed U.S. Department of Transportation ("DOT") number 3427828. *See* Doc. No. 41 at ¶ 5, Doc. No. 41-5, and Doc. No. 42 at ¶ 5.[2]

The following day, Mr. Stokes and the "dispatcher" began exchanging text messages. *See* Doc. No. 42-8.[3] During this exchange, which lasted several days, Mr. Stokes shared photographs of the accident and information concerning the costs to repair his vehicle. *See id.* At one point, the exchange grew tense, with the purported "dispatcher" writing, "HE IS NOT GOING TO GIVE YOU MORE MONEY FOR REPAIRS AND YOU ARE AGREE [sic] TO PROCEED WITH LAWYER." *See id.* (emphasis in original). Mr. Stokes responded, "[i]f I wanted to I could have let the police take his insurance card and I didn't have him take it right take my word." *See id.* The "dispatcher" then stated, "[t]hat would be a ticket for him because he doesn't have insurance yet." *See id.* Again, Mr. Stokes repeated, "[i]f I want something bad to happen to him it would've happened a long time ago at the night of the accident with the police." *See id.* at 22.

Mr. Stokes and the "dispatcher" ultimately reached an agreement, which was memorialized in writing and signed by Yuliceide Alcantara J as a "witness." *See id.* Mr. Stokes was thereafter paid approximately $2,589.00 in several installments via a payment application. *See* Doc. No. 42-

---

[2]     Plaintiffs deny the truck was operated by Xima on the date of Mr. Stokes' accident. *See* Doc. No. 42 at ¶ 5.

[3]     Doc. No. 42-8, or Exhibit "E" to Plaintiffs' response in opposition to the motion for summary judgment, contains the purported text message exchange.

9. However, beyond these exchanges, Mr. Stokes confirmed that he did not personally engage in any research or other efforts to determine Mr. Ramirez's or Xima's insured status. *See* Doc. No. 41 at ¶ 3 (citing Doc. No. 41-9 at (N.T. 30:4-24, 31:1-3).

At the time of the accident, Mr. Stokes was insured by NJM under a policy of automobile insurance which provided for under and uninsured motorist benefits. *See* Doc. No. 1 at ¶ 7, Doc. No. 10 at ¶ 8. At some point following the accident, but before filing the instant lawsuit, Mr. Stokes opened a claim for insurance benefits with NJM. *See* Doc. No. 41 at ¶ 6, Doc. No. 42 at ¶ 6. In doing so, Mr. Stokes submitted the U.S. DOT number that was associated with the semi-trailer truck involved in the accident. *Id.* Using this number, NJM searched the Federal Motor Carrier Safety Administration's public database, which revealed that Xima held a $1 million automobile liability insurance policy that was in effect during the accident. *See* Doc. No. 41 at ¶ 7, Doc. No. 41-6. On May 25, 2021, Anna Condron, an NJM representative, emailed Plaintiffs' counsel's office and explained that "[b]y appearance of the DOT report there is $1MIL in coverage." *See* Doc. No. 41 at ¶ 8, Doc. No. 41-7. Plaintiffs' counsel's office responded, in relevant part, "[w]e have no information on the tortfeasor other than its XIMA Transportation Corp. And … If there is a 1M policy in place then obviously we DO NOT NEED a UM claim." *See* Doc. No. 41 at ¶ 9, Doc. No. 41-7 (emphasis in original). Despite this, there is no indication that Plaintiffs or their attorneys contacted Xima or its insurer. Instead, Plaintiffs' counsel sent a follow up letter to NJM dated February 7, 2022 with a settlement offer. *See* Doc. No. 1 at 24 (referred to as "Exhibit B" to the Complaint). This letter explained "[s]hould this offer not be accepted by March 7, 2022 it is our intention to proceed to trial and obtain a verdict, plus delay damages, in excess of our policy limits demand." *Id*.

4

**B.  Procedural History.**

On January 11, 2023, Plaintiffs initiated this lawsuit against NJM alleging breach of contract (Count I), bad faith (Count II), and loss of consortium (Count III). *See* Doc. No. 1. On March 30, 2023, NJM moved to dismiss Count II of the Complaint, and the Parties, by stipulation, agreed to dismiss the claim without prejudice. *See* Doc. Nos. 8, 9. On May 15, 2023, NJM filed its Answer denying all liability. *See* Doc. No. 10.

On June 9, 2023, the Parties consented to jurisdiction by a U.S. Magistrate Judge, and the matter was reassigned to the undersigned for all remaining proceedings. *See* Doc. Nos. 17 and 18. Following a Rule 16 Scheduling Conference, the Court entered its first Scheduling Order, which indicated that all discovery shall be completed by November 9, 2023. *See* Doc. No. 25. On October 16, 2023, NJM moved for an extension of the discovery deadlines, which in relevant part, explained that both parties were attempting to subpoena records from Xima to examine Mr. Ramirez's employment file, to the extent one existed. *See* Doc. No. 26. The Court granted Defendant's motion, and the discovery deadline was extended to January 8, 2024. *See* Doc. No. 29.

Months later, on December 8, 2023, Plaintiffs filed an unopposed motion for an extension of discovery deadlines, again citing unsuccessful efforts to subpoena non-party witnesses including the former owner of Xima, Mr. Bernardo Rodriguez Trejo ("Mr. Trejo"). *See* Doc. No. 30. A few days later, Plaintiffs filed a motion to enforce a subpoena against Xima's alleged insurer, National Specialty Insurance, and the Court granted the motion on December 18, 2023. *See* Doc. Nos. 32 and 33.

On December 22, 2023, Plaintiffs filed a second motion to enforce a subpoena, this time against Mr. Trejo. *See* Doc. No. 36. That same day, the Court granted Plaintiffs' motion for an extension of time, and issued a Second Amended Scheduling Order. *See* Doc. No. 37. The new

discovery deadline was set as March 8, 2024. *See id.* at ¶ 2. The deadline for affirmative expert reports and any rebuttals was March 8, 2024 and April 5, 2024, respectively. *See id.* at ¶¶ 4 and 5. The deadline for summary judgment motions was April 26, 2024. *See id.* at ¶ 7. In relevant part, the Order contained a footnote that explained as follows:

> The Court expects the Parties to engage in discovery promptly and diligently without delay. Although counsel may, independent of Court involvement, agree to extend the deadline to complete discovery in this case, the Court will not entertain any future requests for an extension of the deadlines to file dispositive motions and the trial deadlines, as set forth in this Order.

*See id.* at ¶ 2, n. 1.

On January 4, 2024, the Court denied Plaintiffs' motion to enforce the subpoena against Mr. Trejo explaining that Plaintiffs failed to properly serve Mr. Trejo in compliance with the Federal Rules of Civil Procedure and controlling Third Circuit precedent. *See* Doc. No. 38. On January 12, 2024, Plaintiffs filed a Certificate of Service for Mr. Trejo's subpoena, which indicated that the subpoena was served on January 5, 2024. *See* Doc. No. 39. According to the subpoena materials, Mr. Trejo was scheduled to appear for a Zoom deposition on January 26, 2024. *See id.*

Following the conclusion of discovery, neither Party contacted the Court and there were no further filings before Defendant moved for summary judgment on April 26, 2024. *See* Doc. No. 41. In relevant part, Defendant explained that claims for uninsured motorist benefits, like the one at issue here, arise from the controlling insurance policy, and therefore, are breach of contract actions. *See* Doc. No. 41-2 at 16 (citations omitted). Given this, Defendant argued that Plaintiffs must prove every element of the action, which includes most importantly that the alleged tortfeasor vehicle falls under the definition of "uninsured motor vehicle." *See id.* at 17 (citations omitted). According to Defendant, federal DOT records, together with other record evidence, confirmed that Xima had a $1 million automobile liability insurance policy, and that Plaintiffs were aware of said policy. *See id.* at 17. Yet, for whatever reason, Plaintiffs did not file suit against Mr. Ramirez or

Xima within the two-year statute of limitations. *See id.* at 19. Instead, Defendant argued that Plaintiffs rely exclusively on inadmissible, hearsay text messages from an unidentified "dispatcher," which are insufficient to support their claims. *See id.* at 7.

On May 17, 2024, Plaintiffs filed their Response in opposition to NJM's summary judgment motion. *See* Doc. No. 42. In doing so, Plaintiffs informed the Court—for the first time—that they had previously filed a motion to compel on February 23, 2024 in the United States District Court for the District of New Jersey seeking again to enforce a subpoena against Mr. Trejo. *See id.* at 5. Plaintiffs explained that a telephone hearing to transfer jurisdiction from New Jersey to the Eastern District of Pennsylvania was held on May 16, 2024. *See id.* Plaintiffs' Response also explained that on May 9, 2024, they filed their first claim against Xima's insurance policy. *See id.* at 9. Finally, Plaintiffs' Response noted that on May 13, 2024—i.e., more than sixty days after the deadline set in the Court's Scheduling Order—they produced the "expert" opinion of Michael Savett, Esquire, which they relied on heavily in opposing NJM's motion. *See id.* at 9.

Most significantly, Plaintiffs argued that "[t]he mere presence of a policy of insurance does not prove coverage for a specific accident was available," and that although Plaintiffs initially bear the burden of proving uninsured status, "a plaintiff may meet that burden if the plaintiff has made reasonable efforts to determine whether such [] coverage exists, but the efforts have been in vain." *See* Doc. No. 42 at ¶ 26-28 (citations omitted). According to Plaintiffs, several courts recognize the "impossibility of proving a negative," and therefore, shift the burden to the insurer to come forward and show the existence of a policy under these circumstances. *See* Doc. No. 42-2 at 11-12. Plaintiffs further explained that although NJM identified a policy held by Xima, it has *not* demonstrated that Mr. Ramirez was subject to that policy, and Plaintiffs insist there is good reason to believe he is not. First, the "dispatcher's" text messages explicitly suggest that Mr. Ramirez was

not insured and that he was being paid "under the table." *See id.* at 7. Indeed, there is no evidence that Xima even had knowledge of the accident. According to Plaintiffs, "the fact that Xima had no contact with either the accident, no contact with the payments [between Mr. Stokes and the "dispatcher"], and failed to file an incident report [with their insurer] alone means the question of coverage should be an issue for the fact-finder." *See id.* at 15.

That same day, Plaintiffs' action to enforce their subpoena against Mr. Trejo was transferred from the District of New Jersey to the Eastern District of Pennsylvania. *See* Doc. No. 9, Civ. Action No. 24-2127. On May 31, 2024, the Parties consented to jurisdiction by a U.S. Magistrate Judge, and that matter was again reassigned to the undersigned for all remaining proceedings. *See* Doc. Nos. 13 and 19, Civ. Action No. 24-2127.

On June 3, 2024, NJM moved for leave to file a Reply brief in further support of its motion, which this Court granted. *See* Doc. Nos. 44 and 49. In doing so, Defendant argued that Plaintiffs' expert report and attorney affidavit are both procedurally and substantively defective, and therefore, should be disregarded by the Court. *See* Doc. No. 49 at 1-3, 5-8. More significantly, Defendant argued that the suggested "reasonable efforts" test is not the law, and that under Pennsylvania law, Plaintiffs bear the burden of proving uninsured motorist coverage. *See id.* at 3-5. According to Defendant, the one case that arguably shifts the burden, which Plaintiffs did not cite to, clearly does not apply to this situation. Defendants explained that in that case, *Meerzon v. Erie Ins. Co.,* 551 A.2d 1106 (Pa. Super. Ct. 1988), the purported tortfeasor misrepresented his name, telephone number, insurance company, policy number, and license plate, leaving plaintiff with no recourse to determine insurance status. *See id.* at 4-5. Unlike *Meerzon*, Defendant argued that Plaintiffs not only knew the identities of the alleged tortfeasors but they explicitly named them in the Complaint allegations. Moreover, Defendant maintained there is record evidence showing

that the vehicle involved in the accident carried liability insurance. *Id.* Defendant explained that "Plaintiffs apparently did no investigation into the identified tortfeasors' insurance before suit," and failed to timely file suit or otherwise initiate a claim even after NJM brought the policy to their attention. *See id.* at 10-12. In short, Defendant insists that basic steps could "have been taken long ago by Plaintiffs to create a factual record," and they cannot now, "at the summary judgment stage in this case, rely on speculation and rest on their pleadings as to what they *believed* to be the case about insurance coverage." *Id.* at 11 (emphasis in original).

On June 18, 2024, the undersigned issued an Order directing the Parties to appear for oral argument on July 1, 2024 concerning Plaintiffs' outstanding motion to compel the deposition of Mr. Trejo and Defendant's motion for summary judgment. *See* Doc. No. 51.[4] The evening prior to argument, Plaintiffs' counsel emailed a letter to Chambers explaining that their private investigator, Bob Vance ("Mr. Vance"), successfully contacted the individual who spoke and texted with Plaintiff after the accident, Yuliceide Alcantara Jiminez ("Ms. Jiminez"). Plaintiffs' counsel then sent an accompanying affidavit signed by Mr. Vance, which outlined his numerous attempts to contact Ms. Jiminez, culminating ultimately in a conversation in which Ms. Jiminez explained that Mr. Ramirez had purchased the truck involved in the accident, and that the truck was not owned or operated by Xima on the date of the accident. *See* Doc. No. 55-4 at 4-5.[5]

During the argument, the undersigned confirmed the above-referenced procedural history before addressing each motion. *See* Doc. No. 61 at 3-6. In relevant part, Plaintiffs' counsel confirmed that he did *not* notify the Court of the pending motion to compel with the District of

---

[4]     The day prior, Plaintiffs filed a motion to transfer the action to the arbitration program. *See* Doc. No. 50.

[5]     Mr. Vance's affidavit was subsequently filed as Exhibit "A" to Plaintiffs' motion for leave to file an amended complaint. *See* Doc. No. 55-4.

New Jersey until Plaintiffs filed their Response in opposition to Defendant's summary judgment motion. *See id.* at 9:7-14, 11:6-25, 12:1-6. Plaintiffs' counsel also confirmed that Plaintiffs only first served NJM with Mr. Savett's "expert" opinion on May 13, 2024, and that they did not otherwise consult with counsel for NJM about doing so after the March 8, 2024 deadline. *See id.* at 9:15-25, 10:1-3. Finally, Plaintiffs' counsel confirmed that Plaintiffs did not file a claim against Xima's insurance policy until after NJM filed its summary judgment motion—i.e., nearly eighteen months after initiating this lawsuit, and nearly three years after being informed by an NJM representative that Xima maintained a $1 million insurance policy. *See id.* at 14:19-25, 31:5-25, 32-35:1. Nevertheless, Plaintiffs' counsel insisted that in light of Mr. Vance's successful contact with Ms. Jiminez, Plaintiffs planned to file a motion for leave to amend the Complaint to remove any allegations concerning Xima's purported ownership of the semi-truck involved in the accident. *See id.* at 13:5-9. Plaintiffs' motion to amend was subsequently filed the next day on July 2, 2024. *See* Doc. No. 55.  On July 15, 2024, NJM filed its response in opposition to the motion arguing, in relevant part, that Plaintiffs' proposed amendments are futile and amount to the "quintessential example of 'undue' delay." *See* Doc. No. 66-2 at 10.

The matter is now ripe for disposition.

## II.        DISCUSSION

### A. Plaintiffs' Motion to Compel the Deposition of Bernardo Rodriguez Trejo.

"The Federal Rules of Civil Procedure construe discovery broadly and contain no deadline for the filing of a motion to compel." *Pathmark Stores, Inc. v. Gator Monument Partners, LLP*, No. CIV.A. 08-3082, 2009 WL 2762836, at *1 (E.D. Pa. Aug. 26, 2009). However, "[c]ourts possess 'formidable case-management authority.'" *P.R. Med. Emergency Grp., Inc. v. Iglesia Episcopal Puertorriquena, Inc.*, 326 F.R.D. 363, 364 (D.P.R. 2018) (quoting *Rosario–Diaz v. González,* 140 F.3d 312, 315 (1st Cir. 1998)). Indeed, the Federal Rules "grant courts considerable

authority to enforce case-management orders." *Id.* (citing Fed. R. Civ. P. 16(f)); *see also Tower Ventures, Inc. v. City of Westfield*, 296 F.3d 43, 46 (1st Cir. 2002) ("Scheduling orders are essential tools in that process—and a party's disregard of such orders robs them of their utility."). In this regard, "a court may find a motion to compel untimely for any number of reasons," *Pathmark Stores, Inc.*, No. CIV.A. 08-3082, 2009 WL 2762836, at *1. More specifically, courts consistently deny discovery motions as untimely when filed after the discovery deadline. *See, e.g., Wiener v. AXA Equitable Life Ins. Co.*, 481 F. Supp. 3d 551, 561 (W.D.N.C. 2020) (observing that in its district, "a party must generally move to compel a party to comply with a discovery request prior to the close of discovery or the motion is untimely.") (quotes and citation omitted); *Owen v. No Parking Today, Inc.*, 280 F.R.D. 106, 112 (S.D.N.Y. 2011) ("A party ordinarily must file a motion to compel before the close of discovery and if it fails to do so, the motion will be deemed untimely.").

Before the Court now is Plaintiffs' motion to compel the deposition and production of documents by a non-party individual, Mr. Trejo. *See* Doc. No. 1, Civ. Action No. 24-2127. Mr. Trejo is allegedly the former owner and operator of Xima, and the information being sought via Plaintiffs' motion is presumptively relevant. Mr. Trejo likely can confirm whether Mr. Ramirez was employed by Xima or otherwise covered by Xima's $1 million insurance policy. Indeed, Defendant NJM has never formally opposed the motion, or any of Plaintiffs' prior efforts to seek discovery from Mr. Trejo or Xima. *See* Doc. No. 61 at 19:2-16.

Despite this, Plaintiffs' motion is denied as untimely. Although Plaintiffs do not explicitly ask for this, the import of granting their motion would be to re-open fact discovery. Under these circumstances—where the Parties have already engaged in discovery over an eight-month period, after the Court has already extended the deadline on two separate occasions, and on the eve of

trial—the Court declines to do so. To be sure, Plaintiffs filed their motion within the March 8, 2024 discovery deadline, as set forth in the latest Scheduling Order. However, this language concerned motions that were filed on this Court's docket or motions that were brought to the Court's attention. Here, Plaintiff initially filed their motion with the District of New Jersey and took *no* steps to notify the Court that they had done so. In fact, the Court did not learn of this motion until *several months* after the discovery deadline expired, and *after* NJM had already filed its summary judgment motion. During oral argument, counsel for Plaintiffs conceded that they made no effort to notify the Court of the pending motion and had no explanation to excuse said failure. *See id.* at 9:7-14, 11:6-25, 12:1-6.[6] At this very late juncture, the Court will not reopen discovery, and extend all remaining deadlines based on nothing more than speculation. Ultimately, "[i]n every [case] there comes a time when discovery must be closed for the issues to be resolved through summary judgment and/or trial." *Stambler v. RSA Sec., Inc.*, 212 F.R.D. 470, 472 (D. Del. 2003). This is such a time.[7]

---

[6]     Were this an isolated occurrence, the Court may have been more amenable to permitting Plaintiffs one more opportunity to depose Mr. Trejo. But Plaintiffs also disregarded the Court's Scheduling Order in several other respects, including the production of expert reports. The deadline to submit affirmative reports was March 8, 2024, with any rebuttals due April 5, 2024. Plaintiffs did not honor these deadlines. Instead, they produced the alleged expert opinion of Michael Savett, Esquire on May 13, 2024, thus requiring Defendant to seek leave to file a Reply brief. *See e.g., Foster v. Attias*, No. CV 18-4853, 2021 WL 5071517, at *2 (E.D. Pa. May 6, 2021) (observing that defendants would be required to expend additional time and money to review the report, engage a rebuttal expert, and pursue expert depositions, which weighed in favor of excluding an untimely report). Indeed, Plaintiffs' Pretrial Memorandum listed five additional expert witnesses for trial, none of whom were disclosed to NJM by the March 8, 2024 deadline. This is unacceptable.

[7]     It is also evident that Plaintiffs could have obtained the sought after information—i.e., Mr. Ramirez's employment and insurance status—through alternative means. First, Plaintiffs could have filed a claim against Xima's insurance policy before even initiating this lawsuit. Instead, Plaintiffs waited *nearly three years* to do so. *See* Doc. No. 42 (whereby Plaintiffs informed the Court in response to NJM's summary judgment motion that they filed their first claim against Xima's policy on May 9, 2024, despite knowing of its existence since May 2021).

    Next, Plaintiffs could have sought discovery from several other non-parties to this litigation, including from Mr. Ramirez directly and the purported "dispatcher" now identified as Ms. Jiminez. On the day of the accident, Mr. Stokes took a photograph of Mr. Ramirez's driver's license and had the telephone

**B.  Plaintiffs' Motion to Amend.**

For largely the same reasons noted above, Plaintiffs' motion for leave to amend the Complaint is also denied. To be sure, the Third Circuit has explained that "[d]istrict courts 'should freely give leave [to amend] when justice so requires.'" *Schomburg v. Dow Jones & Co.*, 504 F. App'x 100, 103 (3d Cir. 2012) (quoting Fed. R. Civ. P. 15(a)(2)). Our court of appeals embraces a "liberal policy toward allowing amendment to correct errors in the pleadings," because it "furthers one of the basic objectives of the federal rules—the determination of cases on their merits." *Id.* (citation and quotations omitted). Given this, "leave to amend ordinarily should be denied only when amendment would be inequitable or futile." *Id.* (citing *Great W. Mining & Min. Co. v. Fox Rothschild LLP*, 615 F.3d 159, 174 (3d Cir. 2010)). But there are limits to this policy. "While delay alone is insufficient to justify denying leave to amend, 'at some point, the delay will become undue, placing an unwarranted burden on the court, or will become prejudicial, placing unfair burden on

---

number for the individual described only as a "dispatcher." Yet, there is no indication that Plaintiffs took any efforts to secure their cooperation until after the discovery deadline (and *after* NJM filed its motion). In response to NJM's summary judgment motion, Plaintiffs submitted the affidavit of Ethan B. Rodan, Esquire, an attorney at Plaintiffs' counsel's firm. *See* Doc. No. 42-21. The Rodan affidavit indicated that he was contacted by counsel for Plaintiffs and asked to contact Mr. Ramirez. *See id.* at ¶ 4. But the affidavit does not explain when he initially attempted to make contact with Mr. Ramirez, and instead indicates that on May 9, 2024, he received a call from a person who identified himself as Mr. Ramirez. *See id.* at ¶ 9. The affidavit does not detail any efforts taken by Mr. Rodan, or anyone else, to confirm the identity of this individual.

Next, just prior to oral argument, Plaintiffs' counsel emailed the Court an affidavit from their private investigator, Bob Vance. *See* Doc. No. 55-4 at 4-5 (noted as "Exhibit B" to Plaintiffs' motion for leave to file an amended complaint). The Vance affidavit is similarly devoid of basic details. For example, Mr. Vance explained that he was hired by counsel for Plaintiffs to contact Ms. Jiminez, but he does not indicate when he was hired to undertake this task. Mr. Vance also indicated that he "made several unsuccessful attempts at contact," without explaining what those attempts entailed, how many times he attempted to make contact, or when. The affidavit merely indicated that Mr. Vance "made contact with a woman who identified herself as Yuliceide Jiminez," the *same* individual noted as a "witness" in the payment agreement that Mr. Stokes had negotiated just days after the accident in 2021. Mr. Vance did not explain when contact was made, whether it was by phone or some other means, or any steps he took to confirm the identity of this individual.

the opposing party." *Evans v. City of Philadelphia*, 763 F. App'x 183, 185 (3d Cir. 2019) (quoting *Adams v. Gould Inc.*, 739 F.2d 858, 868 (3d Cir. 1984)) (internal quotes omitted).

That is exactly what happened here. Even prior to initiating this lawsuit, Plaintiffs have consistently reported to NJM that Xima Transportation Corporation was at least partially responsible for the accident involving Mr. Stokes. In May of 2021, NJM notified Plaintiffs' counsel that Xima held a $1 million policy, and Plaintiffs' counsel acknowledged under these circumstances an uninsured motorist claim would not be necessary. *See* Doc. No. 41 at ¶¶ 8-9, Doc. No. 41-7. Nonetheless, Plaintiffs took no action against Xima or its insurer, and instead filed its lawsuit against NJM in January 2023.

In doing so, Plaintiffs not only identified Xima in the Complaint allegations, but the Parties singularly focused on Xima throughout the discovery process.[8] Over the course of eight months, both Parties sought discovery from Xima and its insurer and twice asked this Court for an extension of time to secure their cooperation. That discovery period completed without any further extension requests, and without any further explanation to the Court of ongoing discovery challenges. Rather, NJM filed its summary judgment motion in accordance with the Court's scheduling order.

Now, eighteen months after filing their Complaint, and three months after Defendant moved for summary judgment, Plaintiffs have moved to amend their pleadings to remove any allegations concerning Xima's purported ownership of the semi-truck involved in the accident. *See* Doc. No. 55. In support thereof, Plaintiffs attached two exhibits—the affidavit of Ethan B. Rodan, Esquire, an attorney at Plaintiffs' counsel's firm, and the affidavit of Bob Vance, a private investigator hired by Plaintiffs. *See* Doc. No. 51-4. According to Plaintiffs, these affidavits

---

[8] NJM specifically noted that "[t]he insurance status of the identified tortfeasor-owner, Xima Transportation Corp., was the salient point of investigation in discovery." *See* Doc. No. 62-2 at 4.

demonstrate that Mr. Ramirez was *not* employed by Xima *and* did not have insurance on the date of the accident.

This is insufficient. Of course, these affidavits largely consist of nothing more than hearsay testimony. But more troubling still, they are devoid of basic details to support Plaintiffs' assertion that they diligently sought this information throughout discovery. Neither Mr. Rodan nor Mr. Vance identified *when* they began their efforts to make contact with non-party witnesses. For example, Mr. Rodan explained that after some investigation, he spoke with a woman purporting to be Mr. Ramirez's wife, and on May 9, 2024, Mr. Ramirez called him back. *See id.* at 2-3. But the affidavit does *not* explain when he was asked to assist in this way, nor does it explain when he first attempted to contact Mr. Ramirez. Mr. Vance's affidavit is similarly vague. Like Mr. Rodan, he explained, "I was contacted by counsel for Plaintiffs and asked to contact . . . Yuliceide Alcantara Jiminez," without identifying *when* he was hired for this task. *See id.* at 4. He vaguely explained that he made "several unsuccessful attempts at contact," without specifying what those attempts entailed or when they even took place.

In short, there is no indication that Plaintiffs attempted to contact either individual until *after* discovery ended (and perhaps *after* NJM moved for summary judgment).[9] In the absence of any colorable explanation, I find that Plaintiffs have unduly delayed the filing of their motion and as such it is denied.[10]

---

[9]     Importantly, Plaintiffs not only knew Mr. Ramirez's and Ms. Jiminez's identity prior to filing this lawsuit, but they also had their contact information. Mr. Stokes took a photograph of Mr. Ramirez's driver's license on the evening of the accident. *See* Doc. No. 42-6. The following day Mr. Stokes began exchanging text messages with Ms. Jiminez and ultimately negotiated a written agreement with her where she explicitly identified herself as a witness. *See* Doc. No. 42-8.

[10]     In opposing Plaintiffs' motion, NJM  noted that it has "expended thousands of dollars in legal fees for subpoena service, depositions, and the preparation of its Motion for Summary Judgment," and it would be unduly prejudicial to them—and burdensome to the Court—to begin another round of discovery.  *See* Doc. No. 66-2 at 11. The undersigned agrees. "When considering the issue of prejudice, a court must determine whether allowing the amendment would result in additional discovery, cost, and preparation to

**C. Defendant's Motion for Summary Judgment.**

Turning next to Defendant's motion for summary judgment, the Court finds that NJM has shown that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. As such, Defendant's motion is granted and the matter is dismissed in its entirety.

Summary judgment is appropriate only in cases where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those that "might affect the outcome of the suit under the governing law." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). At the summary judgment stage, the facts and evidence are viewed in "the light most favorable to the nonmoving party." *Razak v. Uber Technologies, Inc.*, 951 F.3d 137, 144 (3d Cir. 2020).

The moving party has the initial burden of showing an absence of a genuine dispute as to any material fact. *See Anderson*, 477 U.S. at 256. This includes any argument that there is no evidence to support an essential element of the nonmoving party's case. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). After the movant has made this initial showing, the burden then shifts to the nonmoving party to demonstrate that there is sufficient evidence in the record that would support a jury verdict in their favor. *See id.* at 322–23. Importantly, speculation and

---

defend against new facts or new theories." *Special Risk Ins. Servs., Inc. v. GlaxoSmithKline, LLC*, No. CV 19-3002, 2021 WL 6075892, at *1 (E.D. Pa. Mar. 11, 2021) (citing *Cureton v. NCAA*, 252 F.3d 267, 273 (3d Cir. 2001)). The proposed amendments, which change the underlying facts of the case, would undoubtedly require additional discovery. The Parties have already completely discovery predicated on the underlying assumption of Xima's involvement in the accident. To reopen discovery now, after already twice extending the deadlines, and after extensive briefing on Defendant's summary judgment motion, is needlessly wasteful. *See  Ickes v. Borough of Bedford*, 271 F.R.D. 458, 461 (W.D. Pa. 2010) ("Beginning another round of discovery would be quite burdensome of the Defendant[], as well as the Court, and constitute an undue prejudice.").

conclusory allegations by the nonmoving party are not enough to defeat a summary judgment motion. *Razak, Inc.*, 951 F.3d at 144.

Plaintiffs' uninsured motorist claim arises from the insurance policy between Mr. Stokes and Defendant NJM and is therefore appropriately regarded as a breach of contract action.  *See, e.g., Erie Ins. Exch. v. Bristol*, 174 A.3d 578, 585-590 (Pa. 2017) (analyzing uninsured motorist benefits claim as breach of contract action in determining running of statute of limitations). Given this, Plaintiffs bear the burden of proving the following three elements to support their claims: (1) the existence of a contract and its essential terms, (2) a breach of the contract, and (3) the resulting damages. *See De Lage Landen Fin. Servs., Inc. v. Ramkelawan*, No. CV 06-1747, 2006 WL 8460228, at *2 (E.D. Pa. Dec. 12, 2006). To present a contractual insurance claim for uninsured motorist benefits, Plaintiffs must demonstrate that the alleged tortfeasor falls under the definition of "uninsured motorist vehicle" per 75 Pa. C.S. § 1702. *See State Farm Mut. Auto. Ins. Co. v. Foster,* 889 A.2d 78, 82 (Pa. 2005).

As Defendant correctly observed, Plaintiffs failed to produce any admissible evidence during discovery demonstrating that the semi-truck involved in the accident fell within this definition. Rather, Plaintiffs rely solely on text messages between Mr. Stokes and an unidentified individual to suggest that Mr. Ramirez was uninsured. More specifically, Plaintiffs note that this individual, who purported to speak on behalf of Mr. Ramirez, texted, "[t]hat would be a ticket for him because he doesn't have insurance yet." *See* Doc. No. 42-2 at 3. But these statements amount to nothing more than hearsay, and no exception to the hearsay bar readily applies. "Although evidence may be considered in a form which is inadmissible at trial, the content of the evidence must be capable of admission at trial." *Bouriez v. Carnegie Mellon Univ.*, No. CIV.A. 02-2104, 2005 WL 2106582, at *2 (W.D. Pa. Aug. 26, 2005). On this record, without any affidavit from the

individual whom Mr. Stokes was texting, or some other corroborating evidence, Plaintiffs cannot rely on hearsay evidence when opposing NJM's summary judgment motion.[11]

Instead, the record evidence suggests that the semi-truck was subject to a $1 million automobile liability policy applicable at the time of the accident. In May of 2021, NJM searched the Federal Motor Carrier Safety Administration's public database, which revealed that Xima held a $1 million automobile liability insurance policy that was in effect during the accident. *See* Doc. No. 41 at ¶ 7, Doc. No. 41-6. These results were included as Exhibit "X" to NJM's motion, and the Court may take judicial notice of "records and reports of administrative bodies" and their contents. *Golden v. Cook*, 293 F. Supp. 2d 546, 551 (W.D. Pa. 2003) (citation omitted). *See also* Fed. R. Evid. 201; *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000) (taking judicial notice of public SEC filings); *Sturgeon v. Pharmerica Corp.*, 438 F. Supp. 3d 246 (E.D. Pa. 2020).

---

[11]     Of course, and as already discussed at length above, Plaintiffs submitted an affidavit from their private investigator, which contends that he's identified the individual who sent these text messages and made contact with her. But this too constitutes nothing more than hearsay evidence and has been submitted well beyond the discovery deadline. Plaintiffs have not received a signed affidavit from Ms. Jiminez attesting to these facts and simply speculate that she may be available to testify at trial.

Moreover, there are significant unexplained concerns with the authenticity of the text messages themselves. Plaintiffs submitted the full text message exchange as Exhibit "E" to their Response in opposition to the summary judgment motion. *See* Doc. No. 42-8. When viewing the exchange, it is apparent that Mr. Stokes' messages are those noted on the left, in gray shading, whereas the "dispatcher's" messages are noted on the right, in blue. When asked about this during oral argument, Plaintiffs' counsel explained that Mr. Stokes provided him with screenshots of these messages. *See* Doc. No. 61 at 27-29. But had Mr. Stokes taken screenshots from his own cellular phone, the message orientation would be inverted—i.e., his messages would be noted on the right, in blue and the "dispatcher's" messages would be on the left, in gray. In other words, it is apparent that Mr. Stokes did *not* take these screenshots, and Plaintiffs' counsel was not sure who did during oral argument.

On July 15, 2024, Plaintiffs' counsel submitted a letter to the Court to follow up on this issue. However, the letter only muddied the waters further. In relevant part, counsel's letter explained, "[a]t the time of the Hearing, Plaintiff's [sic] counsel had incorrectly assumed they were provided by Plaintiff [Mr. Stokes] himself." After researching this further, counsel "learned that staff from "Plaintiff's [sic] firm had called the third party who identified themselves as Julie who provided the text messages which were subsequently made an Exhibit in this case." The letter further clarified that "[t]his was at the outset of the case and since that initial contact, Plaintiff's counsel's office had no other communications with 'Julie' aside from what has been documented in Plaintiff's [sic] numerous filings documenting their attempts to get the witness' full name and information."

Plaintiffs were made aware of this policy as early as May 2021, before initiating their lawsuit, and never once questioned its authenticity. But now, in opposing Defendant's motion, Plaintiffs argued that "[t]he mere presence of a policy of insurance does not prove coverage for a specific accident was available." *See* Doc. No. 42 at ¶ 26-28. Plaintiffs argue further that although it may have initially been their burden to prove uninsured status, they have undertaken considerable efforts to resolve that issue, but those efforts have been regularly stifled by non-compliance with their subpoenas and other discovery devices. Under these circumstances, Plaintiffs argue that several courts recognize the "impossibility of proving a negative," and therefore, shift the burden to the insurer to come forward and show the existence of a policy under these circumstances. *See* Doc. No. 42-2 at 11-12.

Plaintiffs' arguments are unavailing. As an initial matter, Pennsylvania courts have not yet addressed or adopted any variation of the "reasonable efforts" burden-shifting framework advocated by Plaintiffs. But even if the Court were to consider such an approach, the record reveals that Plaintiffs failed to pursue reasonable diligence in ascertaining the insured status of the alleged tortfeasors. Here, Mr. Stokes not only knew the identity of the tortfeasor, but he took a photograph of his license. *See* Doc. No. 42-6. Just one day after the accident, Mr. Stokes exchanged several text messages with an individual that purported to speak on behalf of the tortfeasor, and those messages demonstrate that Mr. Stokes actively did *not* want the responding police officers to confirm Mr. Ramirez's insured status. *See* Doc. No. 42-8 (noting that Mr. Stokes texted, "[i]f I wanted to I could have let the police take [the tortfeasor's] insurance card and I didn't have him take it right take my word," and "[i]f I want something bad to happen to him it would've happened a long time ago at the night of the accident with the police."). And Mr. Stokes conceded that after negotiating an agreement to pay for his car's damage, he took *no* other efforts to determine the

tortfeasor's insured status. *See* Doc. No. 41-2 at 3-4 (reciting Mr. Stokes' testimony, which confirmed that he did not conduct any research into Mr. Ramirez's or Xima's insurance status).

This lack of diligence extends also to Plaintiffs' counsel. In May of 2021, NJM notified Plaintiffs counsel's office that Xima held a $1 million insurance policy, and thus made them aware of potentially applicable coverage for the loss. Plaintiffs' counsel acknowledged this email and responded that an uninsured motorist claim might not be necessary. Doc. No. 41 at ¶¶ 8-9, Doc. No. 41-7. Yet despite this, Plaintiffs, through their counsel, failed to open a claim against Xima's insurer before initiating the instant lawsuit against NJM. Plaintiffs have no explanation for this delay.

Defendant is correct that basic steps could "have been taken long ago by Plaintiffs to create a factual record," and they cannot now, "at the summary judgment stage in this case, rely on speculation and rest on their pleadings as to what they *believed* to be the case about insurance coverage." *See* Doc. No. 49 at 11 (emphasis in original). Having failed to take such efforts, the Court shall grant Defendant's motion for summary judgment.[12]

---

[12]     Having granted Defendant's motion for summary judgment, Plaintiffs' motion to transfer the civil action to the arbitration program, *see* Doc. No. 50, is hereby denied as moot. Likewise, the Parties' pending motions *in limine*, *see* Doc. Nos. 57-60 and 63-65, are also denied as moot.

## III.      CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment, *see* Doc. No. 41, is

GRANTED, and judgment is entered in Defendant's favor. The Court further holds that Plaintiffs'

motion to compel the deposition and production of documents by Mr. Trejo*, see* Doc. No. 1, Civ.

Action No. 24-2127; Plaintiffs' motion to transfer the civil action to the arbitration program, *see*

Doc. No. 50, and Plaintiffs' motion for leave to file an amended complaint, *see* Doc. No. 55, are

hereby DENIED. An appropriate Order follows.

BY THE COURT:

*s/Pamela A. Carlos*
PAMELA A. CARLOS
U.S. Magistrate Judge